# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| **HAMILTON COUNTY, TENNESSEE**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; ALLERGAN FINANCE LLC (f/k/a ACTAVIS, INC.);WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.; MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN CORPORATION**<br><br>**Defendants,** | |

## COMPLAINT

Plaintiff, Hamilton County, Tennessee, by and through its counsel, brings this lawsuit against opioid manufacturers alleging as follows:

## INTRODUCTION

1.      Drug companies should never place their desire for profits above the health and well-being of their customers or the communities where those customers live.  Because they know prescribing doctors and other health-care providers rely on drug companies' statements in making treatment decisions, drug companies must tell the truth when marketing their drugs and ensure that their marketing claims are supported by science and medical evidence.

2.      Defendants broke these simple rules and helped unleash a healthcare crisis that has had far-reaching financial, social, and deadly consequences in Tennessee and across the nation.

3.      Defendants produce, market, and sell prescription opioids (hereinafter "opioids"), including brand-name drugs like Oxycontin and Percocet, and generics like oxycodone and hydrocodone, which are powerful narcotic painkillers.  Historically, because they were considered too addictive and debilitating for the treatment of chronic pain (like back pain, migraines and arthritis),[1] opioids were used only to treat short-term acute pain or for palliative (end-of-life) care.

4.      However, by the late 1990s, and continuing today, each Defendant began a marketing scheme designed to persuade doctors and patients that opioids can and should be used for chronic pain, a far broader group of patients much more likely to become addicted and suffer other adverse effects from the long-term use of opioids.  In connection with this scheme, each Defendant spent, and some continue to spend, millions of dollars on promotional activities and materials that falsely deny or trivialize the risks of opioids while overstating the benefits of using them for chronic pain.  As to the risks, Defendants falsely and misleadingly, and sometimes contrary to the language of their drugs' labels:  (1) downplayed the serious risk of addiction; (2) promoted the concept of "pseudoaddiction" and thus advocated that the signs of addiction should

---

[1] In this Complaint, "chronic pain" means non-cancer pain lasting three months or longer.

be treated with more opioids; (3) exaggerated the effectiveness of screening tools in preventing addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher opioid dosages; and (6) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction. Conversely, Defendants also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no "good evidence" to support these claims.

5.     Defendants disseminated these common messages to reverse the medical understanding of opioids in order to exploit the lucrative market for chronic pain treatments. They disseminated these messages directly, through their sales representatives, and in speaker groups led by physicians recruited by Defendants. Borrowing a page from Big Tobacco's playbook, Defendants also worked through third parties they controlled by: (a) funding, assisting, encouraging, and directing doctors, known as "key opinion leaders" ("KOLs") and (b) funding, assisting, directing, and encouraging seemingly neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups"). Defendants then worked together with those KOLs and Front Groups to taint the sources that doctors and patients relied on for ostensibly "neutral" guidance, such as treatment guidelines, Continuing Medical Education ("CME") programs, medical conferences and seminars, and scientific articles. Thus, working individually and collectively, and through these Front Groups and KOLs, Defendants persuaded doctors and patients that what they had long known—that opioids are addictive drugs, unsafe in most circumstances for long-term use—was untrue, and quite the opposite, that the compassionate treatment of pain *required* opioids.

6.     Each Defendant knew that its misrepresentations of the risks and benefits of opioids were not supported by or were directly contrary to the scientific evidence. Indeed, the falsity of each Defendant's misrepresentations has been confirmed by the U.S. Food and Drug Administration ("FDA") and the Centers for Disease Control and Prevention ("CDC"), including by the CDC in its *Guideline for Prescribing Opioids for Chronic Pain*, issued in 2016 and approved by the FDA ("2016 CDC Guideline"). The FDA and CDC have found that continuing use of opioids for over

three months creates a risk of "opioid disorder" and that opioid use creates a substantial risk of misuse, abuse, withdrawal, addiction, overdose, and death. Opioid manufacturers, including Defendants Endo Pharmaceuticals, Inc. and Purdue Pharma L.P., have also entered into settlement agreements with public entities, including (in the case of Purdue), that prohibit them from making many of the misrepresentations identified in this Complaint. Yet even now, each Defendant continues to misrepresent the risks and benefits of long-term opioid use while failing to correct past misrepresentations.

7. Defendants' efforts have been wildly successful. Opioids are now the most prescribed class of drugs; they generated $11 billion in revenue for drug companies in 2014 alone. In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."[2] The result has been a flood of prescription opioids available for illicit use or sale (the supply), and a population of patients physically and psychologically dependent on them (the demand). And when those patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin.

8. The manufacturer Defendants are not the only entities that are responsible for the saturation of prescription and illegal opioids into Hamilton County. Once the manufacturers created a market for the opioids, the Distributor Defendants helped cause the epidemic by distributing prescription opioids in unprecedented numbers. By failing to report "suspicious" orders, as required by law, the Distributors fueled the growing opioid epidemic, while their profits increased.

9. Hamilton County has been acutely affected by Defendants' practices and is confronting a public health crisis of historic proportions. In 2015, Hamilton County had a

---

[2] Vivek H. Murthy, *Letter from the Surgeon General*, August 2016, available at http://turnthetiderx.org/.

prescribing rate of 123 opioid prescriptions per 100 people in the County according to the Centers for Disease Control and Prevention[3].

10.     As these opioid prescriptions have increased in Hamilton County, so have the opioid deaths. Since 2012, Hamilton County has had 208 overdose deaths according to the Tennessee State Department of Health.

11.     Overdoses and overdose deaths are a particular tragic manifestation of the opioid crises. In Hamilton County, opioid overdose deaths have increased each year from 2013 – 2016. Hamilton County had 35 opioid drug overdose deaths in 2013, 36 opioid drug overdose deaths in 2014, 37 opioid drug overdose deaths in 2015, and 53 opioid drug overdose deaths in 2016.[4] Hamilton County has also seen a significant spike in heroin overdose deaths. From 2012 – 2015, Hamilton County only had 1 overdose death due to heroin. In 2016, Hamilton County had 9 heroin overdose death.[5]

## JURISDICTION AND VENUE

12.     This Court also has subject-matter jurisdiction over this action under 28 U.S.C. §1332(a) based on complete diversity of citizenship between Plaintiffs and all Defendants. The amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     This Court has personal jurisdiction over Defendants because they conduct business in Tennessee, purposefully direct and directed their actions toward Tennessee, consensually submitted to the jurisdiction of Tennessee when obtaining a manufacturer or distributor license, and have the requisite minimum contacts with Tennessee necessary to constitutionally permit the Court to exercise jurisdiction.

---

[3] CDC, U.S. State Prescribing Rates, 2016, available at: https://www.cdc.gov/drugoverdose/maps/rxcounty2016.html

[4] https://www.tn.gov/health/health-program-areas/pdo/pdo/data-dashboard.html

[5] *Id.*

14.     Venue is proper in this District under 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to the claim occurred in this District and each Defendant transacted affairs and conducted activity that gives rise to the claim of relief in this District.

## PARTIES

### A.  Plaintiff

15.     Plaintiff Hamilton County, Tennessee, is located within the Eastern District of Tennessee.  Its total population is 357,738 according to the most recent U.S. Census statistics. Its county seat is Chattanooga.

16.     Hamilton County provides a wide range of services on behalf of its residents, including services for families and children, public health, public assistance, law enforcement, and emergency care.

### B.   Defendants

17.     PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware.  PURDUE PHARMA INC. is a New York corporation with its principal place of business in Stamford, Connecticut, and THE PURDUE FREDERICK COMPANY is a Delaware corporation with its principal place of business in Stamford, Connecticut (collectively, "Purdue").

18.     Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER in the United States and Tennessee.  OxyContin is Purdue's best-selling opioid.  Since 2009, Purdue's annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its 2006 sales of $800 million.  OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

6

19.     CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania.  TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a Delaware corporation with its principal place of business in Pennsylvania.  Teva USA acquired Cephalon in October 2011.

20.     Cephalon, Inc. manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the U.S. and Tennessee.  Actiq and Fentora have been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."[6]  In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million.

21.     Teva USA, and Cephalon, Inc. work closely together to market and sell Cephalon products in the United States.  Teva USA hold out Actiq and Fentora as Teva products to the public.  Teva USA sells all former Cephalon branded products through its "specialty medicines" division.  The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids marketed and sold in Tennessee, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events. (Teva Pharmaceuticals USA, Inc., and Cephalon, Inc. are hereinafter referred to as "Cephalon.")

22.     JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON (J&J), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.  ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.  JANSSEN PHARMACEUTICA INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its

_____

[6] Breakthrough pain is a short-term flare of moderate-to-severe pain in patients with otherwise stable persistent pain.

principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock, and J&J corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J are hereinafter referred to as "Janssen.")

23. Janssen manufactures, promotes, sells, and distributes drugs in the United States and Tennessee, including the opioid Duragesic. Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

24. ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS INC. is a wholly-owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are hereinafter referred to as "Endo.")

25. Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States and Tennessee. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States and Tennessee, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

26. ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ACTAVIS PLC acquired Allergan plc in March 2015, and the combined company changed its name to Allergan plc in January 2013. Before that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. in October 2012, and

8

the combined company changed its name to Actavis, Inc. as of January 2013 and then Actavis plc in October 2013. WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of Allergan plc (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.). ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey and was formerly known as WATSON PHARMA, INC. ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. ALLERGAN FINANCE LLC (f/k/a Actavis, Inc.), a wholly-owned subsidiary of Allergan plc, is a Nevada limited liability company. Each of these defendants is owned by Allergan plc, which uses them to market and sell its drugs in the United States. Upon information and belief, Allergan plc exercises control over these marketing and sales efforts and profits from the sale of Allergan/Actavis products ultimately inure to its benefit. (Allergan plc, Actavis plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are hereinafter referred to as "Actavis.").

27.     Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in the United States and Tennessee. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

28.     Purdue, Cephalon, Johnson & Johnson, Janssen, and Actavis, herein as "Manufacturers" are companies whose primary business is the manufacture, marketing, and distribution of prescription drugs, including opioids.

29.     MCKESSON CORPORATION is a Delaware Corporation with its principal place of business in San Francisco, California. McKesson distributes pharmaceuticals to retail pharmacies and institutions in all 50 states, including the State of Tennessee and Hamilton County. Upon information and belief, McKesson is a pharmaceutical distributor licensed to do business in Tennessee. McKesson does substantial business in the State of Tennessee and Hamilton County.

9

30.     CARDINAL HEALTH, INC.  is an Ohio Corporation with its principal place of business in Dublin, Ohio.  Cardinal distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including the State of Tennessee and Hamilton County.  Upon information and belief, Cardinal is a pharmaceutical distributor licensed to do business in Tennessee and does substantial business in the State of Tennessee and Hamilton County.

31.     AMERISOURCE BERGEN DRUG CORPORATION is a Delaware Corporation with its principal place of business in Chesterbrook, Pennsylvania.  Upon information and belief, Amerisource is a pharmaceutical distributor licensed to do business in the State of Tennessee and does substantial business in the State of Tennessee and Hamilton County.

32.     McKesson Corporation, Cardinal Health, Inc. and AmerisourceBergin Drug Corporation, collectively referred to in this Complaint as "Distributors" are in the chain of distribution of prescription opioids.  Upon information and belief, the Distributors have distributed opioids to physicians in Tennessee and Hamilton County.

### FACTUAL ALLEGATIONS

33.     Before the 1990s, generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care.  Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited.  As a result, doctors generally did not prescribe opioids for chronic pain.

34.     Tens of millions of Americans suffer from and seek treatment for chronic pain. To take advantage of the lucrative market for chronic pain patients, each Defendant developed a well-funded marketing scheme based on deception.  Each Defendant used both direct marketing

and unbranded advertising disseminated by seemingly independent third parties to spread false

and deceptive statements about the risks and benefits of long-term opioid use—statements that

benefited not only themselves and the third-parties who gained legitimacy, but all opioid

manufacturers.  Yet these statements were not only unsupported by or contrary to the scientific

evidence, they were also contrary to pronouncements by and guidance from the FDA and CDC

based on that evidence.  They also targeted susceptible prescribers and vulnerable patient

populations.

**A.     Defendants Used Every Available Avenue to Disseminate Their False and Deceptive Statements About Opioids**

35.     Defendants spread their false and deceptive statements by marketing their branded

opioids directly to doctors and patients in Tennessee.  Defendants also bankrolled and controlled

professional societies and other ostensibly neutral third parties in order to lend these deceptive

statements a veneer of independence and scientific legitimacy.

**B.     Defendants Spread and Continue to Spread Their False and Deceptive Statements Through Direct Marketing of Their Branded Opioids**

36.     Defendants' direct marketing of opioids generally proceeded on two tracks.  First,

each Defendant conducted and many continue to conduct advertising campaigns touting the

purported benefits of their branded drugs.  For example, Defendants spent more than $14 million

on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.  This

amount included $8.3 million by Purdue, $4.9 million by Janssen, and $1.1 million by Endo.

37.     A number of Defendants' branded ads deceptively portrayed the benefits of

opioids for chronic pain.  For example, Endo distributed, and made available on its website

opana.com, a pamphlet promoting Opana ER with photographs depicting patients with

physically demanding jobs such as construction worker and chef, misleadingly implying that the

drug would provide long-term pain-relief and functional improvement.  Purdue also ran a series

of ads, called "Pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively. Janssen used branded advertising and published reprints of journal articles promoting the use of opioids to treat osteoarthritis, even though the FDA found, in reviewing the New Drug Application for Janssen's drug Nucynta ER, that Nucynta ER was no more effective than placebo in reducing osteoarthritis pain. Actavis distributed a product advertisement that falsely claimed that use of Kadian to treat chronic non-cancer pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives. The FDA later warned Actavis such claims were misleading.[7]

38.     Second, each Defendant promoted the use of opioids for chronic pain through "detailers"—sales representatives who visited individual doctors and medical staff in their offices—and small-group speaker programs. Defendants have not corrected this misinformation. In 2014 alone, Defendants spent $168 million on detailing branded opioids to doctors. This amount is twice as much as Defendants spent on detailing in 2000. The amount includes $108 million spent by Purdue, $34 million by Janssen, $13 million by Cephalon, $10 million by Endo, and $2 million by Actavis.

39.     Defendants' detailers have been reprimanded for their deceptive and misleading promotions. A July 2010 "Dear Doctor" letter mandated by the FDA required Actavis to acknowledge to the doctors to whom it marketed its drugs that "[b]etween June 2009 and February 2010, Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]," including the risk of "[m]isuse,

---

[7] Endo and Purdue agreed in late 2015 and 2016 to halt these misleading representations in New York, but they may continue to disseminate them in Tennessee.

[a]buse, and [d]iversion of [o]pioids" and, specifically, the risk that "[o]pioid[s] have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion."

40. Defendants also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by Defendants. These speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. They were also one of the key ways Defendants' messages were disseminated as medical knowledge: these speakers give the false impression that they are providing unbiased and medically accurate presentations when they are, in fact, presenting a script prepared by Defendants. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

41. Defendants' detailing to doctors is effective. Numerous studies indicate that marketing impacts prescribing habits, with face-to-face detailing having the greatest influence. This, of course, is why pharmaceutical companies engage in the practice. Defendants, moreover, know that detailing is effective because they purchase, manipulate and analyze some of the most sophisticated data available in *any* industry to track, precisely, the rates of initial prescribing and renewal by individual doctors. This data allows Defendants to target, tailor, and monitor the impact of their core messages.

42. Defendants employed the same marketing strategies and deployed the same messages in Tennessee as they did nationwide. Across the pharmaceutical industry, "core

message" development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that Defendants' messages are consistently delivered across marketing channels—including detailing visits, speaker events, and advertising—and in each sales territory. Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

43. Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons (the company employees who respond to physician inquiries); centralized speaker training; single sets of visual aids, speaker slide decks, and sales training materials; and nationally coordinated advertising. Defendants' sales representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide decks, and supervisors rode along with them periodically to both check on their performance and compliance.

44. In February 2018, with legal challenges mounting, Purdue announced that it would cease detailing physicians in respect to Purdue's branded opioids. Purdue did not, however, make any commitment to correct the misrepresentations its multi-decade detailing campaign has engendered in the medical community. Nor did Purdue commit to cease other deceptive marketing tactics, including the practice addressed below of laundering promotional messages through front groups and other ostensibly unbiased third parties. Far from reversing course, Purdue has indicated that it will aggressively promote its drugs that treat opioid-induced constipation—drugs that can only be profitable if opioids are widely prescribed.

**C.  Defendants Used a Diverse Group of Seemingly Independent Third Parties to Spread False and Deceptive Statements About the Risks and Benefits of Opioids**

45. Defendants also deceptively marketed opioids in Tennessee through unbranded advertising—*i.e.*, advertising that promotes opioid use generally but does not name a specific

14

Case 1:18-cv-00061-TAV-CHS    Document 1    Filed 04/12/18    Page 14 of 77    PageID #: 14

opioid. This advertising was ostensibly created and disseminated by independent third parties. But by funding, directing, reviewing, editing, and distributing this unbranded advertising, Defendants controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain. Much in the same way as Defendants controlled the distribution of their "core messages" via their own detailers and speaker programs, Defendants similarly controlled the distribution of these messages in scientific publications, treatment guidelines, CMEs, and medical conferences and seminars. To this end, Defendants used third-party public relations firms to help control those messages when they originated from third-parties.

46. Defendants also marketed through third-party, unbranded advertising to avoid regulatory scrutiny because that advertising is not submitted to and typically is not reviewed by the FDA. Defendants also used third-party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and objective source. Like the tobacco companies, Defendants used third parties that they funded, directed, and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long-term opioid use for chronic pain.

47. Defendants' deceptive unbranded marketing often contradicted what they said in their branded materials reviewed by the FDA. For example, Endo's unbranded advertising contradicted the fine print in its concurrent, branded advertising for Opana ER:

| Pain: Opioid Therapy (Unbranded) | Opana ER Advertisement (Branded) |
| --- | --- |

| Pain: Opioid Therapy (Unbranded) | Opana ER Advertisement (Branded) |
|---|---|
| "People who take opioids **as prescribed usually do not become addicted**." | "All patients treated with opioids require careful monitoring for signs of abuse and addiction, since **use of opioid analgesic products carries the risk of addiction even under appropriate medical use**." |

**D.    Key Opinion Leaders ("KOLs")**

48.    Defendants also spoke through a small circle of doctors who, upon information and belief, were selected, funded, and elevated by Defendants because their public positions supported the use of opioids to treat chronic pain.  These doctors became known as "key opinion leaders" or "KOLs."

49.    Defendants paid KOLs to serve as consultants or on their advisory boards and to give talks or present CMEs, and their support helped these KOLs become respected industry experts.  As they rose to prominence, these KOLs touted the benefits of opioids to treat chronic pain, repaying Defendants by advancing their marketing goals.  KOLs' professional reputations became dependent on continuing to promote a pro-opioid message, even in activities that were not directly funded by Defendants.

50.    KOLs have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs supportive of chronic opioid therapy.  Defendants created opportunities for KOLs to participate in research studies Defendants suggested or chose and then cited and promoted favorable studies or articles by their KOLs.  By contrast, Defendants did not support, acknowledge, or disseminate publications of doctors unsupportive or critical of chronic opioid therapy.

16

51.     Defendants' KOLs also served on committees that developed treatment guidelines that strongly encourage the use of opioids to treat chronic pain, and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs.  These guidelines and CMEs were not supported by the scientific evidence at the time they were created, and they are not supported by the scientific evidence today.  Defendants were able to direct and exert control over each of these activities through their KOLs.  The 2016 CDC Guideline recognizes that treatment guidelines can "change prescribing practices."

52.     Pro-opioid doctors are one of the most important avenues that Defendants use to spread their false and deceptive statements about the risks and benefits of long-term opioid use. Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy. For example, the State of New York found in its settlement with Purdue that through March 2015 the Purdue website *In the Face of Pain* failed to disclose that doctors who provided testimonials on the site were paid by Purdue and concluded that Purdue's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials.

53.     Thus, even though some of Defendants' KOLs have recently moderated or conceded the lack of evidence for many of the claims they made, those admissions did not reverse the effect of the false and deceptive statements that continue to appear nationwide and in Tennessee in Defendants' own marketing as well as treatment guidelines, CMEs and other seminars, scientific articles and research, and other publications available in paper or online.

54.     Defendants utilized many KOLs, including many of the same ones.  Two of the most prominent are described below.

55.     Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom Defendants identified and promoted to further their marketing campaign.  Dr. Portenoy received research support, consulting fees, and honoraria from Cephalon, Endo, Janssen, and Purdue (among others), and was a paid consultant to Cephalon and Purdue.

56.     Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain.  He served on the American Pain Society ("APS") / American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1997 and again in 2009.  He was also a member of the board of the American Pain Foundation ("APF"), an advocacy organization almost entirely funded by Defendants.

57.     Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations.  He appeared on *Good Morning America* in 2010 to discuss the use of opioids long-term to treat chronic pain.  On this widely-watched program, broadcast in Tennessee and across the country, Dr. Portenoy claimed:  "Addiction, when treating pain, is distinctly uncommon.  If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."[8]

To his credit, Dr. Portenoy later admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true."  These lectures falsely claimed that fewer than

---

[8] Good Morning America television broadcast, ABC News (Aug. 30, 2010).

1% of patients would become addicted to opioids. According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks. Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids does not exist."[9] Portenoy candidly stated: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, . . . I guess I did."[10]

### (2) Lynn Webster

58.     Another KOL, Dr. Lynn Webster, was the founder of Lifetree Pain Clinic and Lifetree Clinical Research in Salt Lake City. In 2013, Dr. Webster became the president of the American Academy of Pain Management (AAPM), a front group for the opioid industry (discussed further below), and he remained on AAPM's board of directors for a period thereafter. In these capacities, Dr. Webster authored numerous studies and CMEs supporting chronic opioid treatment, and the industry handsomely rewarded his efforts. Between 2009 and 2013, Dr. Webster received millions of dollars from drug companies, including at least eight payments from Defendant Cephalon—*the largest exceeding $1.6 million*.[11]

59.     Among the misconceptions Dr. Webster peddled was the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indicators of undertreated pain. The only way to differentiate the two, Dr. Webster claimed, was to *increase* a patient's dose of opioids. As he wrote in his book *Avoiding Opioid Abuse While Managing Pain* (2007), which is still available, when facing signs of aberrant behavior,

---

[9] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, WALL ST. J., Dec. 17, 2012.

[10] *Id.*

[11] ProPublica Data, available at: https://projects.propublica.org/d4d-archive/search?company%5Bid%5D=&period%5B%5D=&services%5B%5D=&state%5Bid%5D=45&term=Lynn+Webster&utf8=%E2%9C%93.

increasing the dose "in most cases . . . should be the clinician's first response." Endo distributed this book to doctors and all Defendants latched onto the pseudoaddiction concept it articulated.

60. Another devastating contribution of Dr. Webster's is the so-called Opioid Risk Tool, a widely used five-question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to opioids. In reality, and as the CDC has advised, the Opioid Risk Tool is "extremely inconsistent."[12] But by giving doctors the false impression that opioids can be safely prescribed to a "screened" population, the Opioid Risk Tool became a catalyst for risky prescribing and one that, conveniently, could be billed as a risk-mitigation tool for conscientious practitioners. It is thus little surprise that the tool has been aggressively promoted by Defendants, with versions of it appearing on websites run by Endo, Janssen, and Purdue.

61. Dr. Webster also maintained an active practice at his Lifetree Pain Clinic in Salt Lake City and, tragically, he practiced what he preached. As rumors of overdosed LifeTree patients spread, the DEA raided Dr. Webster's offices and discovered an entire file cabinet labeled "deceased patients."[13] Although Dr. Webster ultimately was not prosecuted, the investigation revealed that 20 patients overdosed and died under his care.

62. Today, Dr. Webster no longer treats patients. He does, however, still function as a mouthpiece for opioid manufacturers' agenda, who continue to pay him significant sums in consulting and other fees. Between 2013 and 2015, Dr. Webster received more than $150,000

---

[12] CDC Guideline for Prescribing Opioids for Chronic Pain (March 18, 2016), available at https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

[13] *Id.*

from drug companies, most of it from manufacturers of opioids, including Defendant Cephalon.[14]

**E.      Front Groups**

63.      Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain.  Under the direction and control of Defendants, these "Front Groups" generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy.  They also assisted Defendants by responding to negative articles, by advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and by conducting outreach to vulnerable patient populations targeted by Defendants.

64.      These Front Groups depended on Defendants for funding and, in some cases, for survival.  Defendants also exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination.  For example, Purdue's consulting agreement with American Pain Foundation ("APF") gave it direct, contractual control over APF's work.  These efforts assured that Front Groups would generate only the messages Defendants wanted to distribute.  Despite this, the Front Groups concealed the extent to which they were bankrolled by Defendants, holding themselves out as independent professional societies faithfully serving the needs of their constituencies—whether patients suffering from pain or doctors treating those patients.

65.      The U.S. Senate Homeland Security & Government Affairs Committee recently completed an investigation into the financial connections between opioid manufacturers and fourteen different Front Groups advocating opioid-related policies and practices.  The

---

[14] *See* ProPublica Data, available at:  https://projects.propublica.org/docdollars/doctors/pid/1136720.

investigation revealed that Defendants Purdue and Janssen, along with opioid manufacturers Mylan, Depomed and Insys, contributed more than $10 million to opioid Front Groups and their affiliates between 2012 and 2017.[15] Of these manufacturers, Purdue contributed the most, with payments exceeding $4 million between 2012 and 2017. Janssen was the second largest contributor until 2015, when it sold the licensing rights to its opioid Nucynta.[16]

66. These disturbing contributions are only the tip of the iceberg. The Senate did not investigate contributions of other opioid manufacturers, including Defendants Endo and Cephalon, and thus, admittedly, did not "capture the full extent of the financial ties between opioid manufacturers and patient advocacy groups and professional societies."[17]

67. The results of the Senate's investigation are set forth in a February 2018 report authored by Missouri Senator McCaskill's office. The report identifies a "direct link between corporate donations" made by opioid manufactures and the front groups' "advancement of opioids-friendly messaging."[18] Elaborating, the report observes:

> Initiatives from the groups in this report often echoed and amplified messages favorable to increased opioid use—and ultimately, the financial interests of opioid manufacturers. These groups have issued guidelines and policies minimizing the risk of opioid addiction and promoting opioids for chronic pain, lobbied to change laws directed at curbing opioid use, and argued against accountability for physicians and industry executives responsible for overprescription and misbranding. Notably, a majority of these groups also strongly criticized 2016 guidelines from the Centers for Disease Control and Prevention (CDC) that recommended limits on opioid prescriptions for chronic pain—the first national standards for prescription opioids and a key federal response to the ongoing epidemic.[19]

---

[15] U.S. Senate Homeland Security & Governmental Affairs Committee, Ranking Member McCaskill's Office, *Fueling the Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups* (Feb. 2018), at 1.

[16] *Id*. at 5-6.

[17] *Id*. at 15.

[18] *Id*. at 1.

[19] *Id*.

68.     Senator McCaskill's report concluded that "[t]hrough criticism of government prescribing guidelines, minimization of opioid addiction risk, and other efforts, ostensibly neutral advocacy organizations have often supported industry interests at the expense of their own constituencies."[20]

69.     To reach a wide audience, and give the impression of professional consensus, opioid manufacturers have bankrolled a diverse array of Front Groups.  All told, Purdue, Janssen, Endo and Cephalon contributed to more than a dozen Front Groups, including many of the same ones.  Two of the most prominent are described below, but there are many others, including the American Pain Society ("APS"), the Federation of State Medical Boards ("FSMB"), the U.S. Pain Foundation ("USPF"), the American Geriatrics Society ("AGS"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF") and Pain & Policy Studies Group ("PPSG").

### (1) American Pain Foundation ("APF")

70.     The most prominent of Defendants' Front Groups was APF, which received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012.[21]  Endo alone provided more than half that funding; Purdue was next, at $1.7 million.

71.     APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction.  APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death – among

---

[20] *Id.* at 3.

[21] Senator McCaskill's February 2018 report studied contributions between 2012 and 2017 and thus did not look into industry contributions to APF.

returning soldiers. APF also engaged in a significant multimedia campaign – through radio, television and the Internet – to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach Tennessee.

72.     In addition to Perry Fine (a KOL from the University of Utah who received funding from Janssen, Cephalon, Endo, and Purdue), Russell Portenoy, and Scott Fishman (a KOL from the University of California, Davis who authored *Responsible Opioid Prescribing*, a publication sponsored by Cephalon and Purdue), all of whom served on APF's Board and reviewed its publications, another board member, Lisa Weiss, was an employee of a public relations firm that worked for both Purdue and APF.

73.     In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million. By 2011, APF was entirely dependent on incoming grants from defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit. As one of its board members, Russell Portenoy, explained, the lack of funding diversity was one of the biggest problems at APF.

74.     APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors. It was often called upon to provide "patient representatives" for Defendants' promotional activities, including for Purdue's *Partners Against Pain* and Janssen's *Let's Talk Pain*. APF functioned largely as an advocate for the interests of

Defendants, not patients. Indeed, as early as 2001, Purdue told APF that the basis of a grant was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

75.     In practice, APF operated in close collaboration with opioid manufacturers. On several occasions, representatives of the drug companies, often at informal meetings at Front Group conferences, suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

76.     APF assisted in other marketing projects for drug companies. One project funded by another drug company – *APF Reporter's Guide: Covering Pain and Its Management* (2009) – recycled text that was originally created as part of the company's training document.

77.     The same drug company made general grants, but even then it directed how APF used them. In response to an APF request for funding to address a potentially damaging state Medicaid decision related to pain medications generally, the company representative responded, "I provided an advocacy grant to APF this year – this would be a very good issue on which to use some of that. How does that work?"

78.     The close relationship between APF and the drug company was not unique, but mirrors relationships between APF and Defendants. APF's clear lack of independence – in its finances, management, and mission – and its willingness to allow Defendants to control its activities and messages support an inference that each Defendant that worked with it was able to exercise editorial control over its publications.

79.     Indeed, the U.S. Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers

of opioid painkillers.  The investigation caused considerable damage to APF's credibility as an objective and neutral third party, and Defendants stopped funding it.  Within days of being targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances."  APF "cease[d] to exist, effective immediately."

### (2)     American Academy of Pain Medicine

80.     The American Academy of Pain Medicine ("AAPM"), with the assistance, prompting, involvement, and funding of Defendants, issued treatment guidelines and sponsored and hosted medical education programs essential to Defendants' deceptive marketing of chronic opioid therapy.

81.     AAPM has received millions of dollars from opioid manufacturers since 2009, including nearly $1.2 million from Defendants Purdue and Janssen in the 2012-2017 period alone.  AAPM also maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate.  The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event— its annual meeting held in Palm Springs, California, or other resort locations.  AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings.  Defendants Endo, Purdue, and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event.

82.     AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members.  Endo attended AAPM conferences, funded its CMEs, and distributed its publications.  The conferences sponsored by AAPM heavily emphasized sessions on opioids—37 out of roughly 40 at one conference alone.  AAPM's presidents have

26

included top industry-supported KOLs Perry Fine, Russell Portenoy, and Lynn Webster.  Dr. Webster was even elected president of AAPM while under a DEA investigation.  Another past AAPM president, Dr. Scott Fishman, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[22]

83.     AAPM's staff understood they and their industry funders were engaged in a common task.  Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

84.     In 1997, AAPM and the American Pain Society jointly issued a consensus statement, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low.  The co-author of the statement, Dr. Haddox, was at the time a paid speaker for Purdue.  Dr. Portenoy was the sole consultant.  The consensus statement remained on AAPM's website until 2011, and was taken down from AAPM's website only after a doctor complained, though it lingers on the Internet elsewhere.

85.     Recognizing the importance of opioid treatment guidelines in securing the acceptance of chronic opioid therapy, AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain.  Fourteen of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Cephalon, Endo, and Purdue.

---

[22] Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), http://www.medscape.org/viewarticle/500829.

86.     The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories. One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Defendants, made to the sponsoring organizations and committee members. The AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited 732 times in academic literature, were disseminated in Tennessee during the relevant time period, are still available online, and were reprinted in the *Journal of Pain*.

87.     Defendants widely referenced and promoted the 2009 Guidelines without disclosing the acknowledged lack of evidence to support them.

88.     When the CDC issued guidelines in 2016 recommending the use of non-opioid therapies in the treatment of chronic pain, AAPM's immediate past president Daniel Carr was highly critical, stating "that the CDC guideline makes disproportionally strong recommendations based upon a narrowly selected portion of the available clinical evidence.[23]

89.     In an effort to retain credibility, AAPM has obscured its financial ties to opioid manufacturers. Nowhere on AAPM's website is it disclosed that AAPM has received millions of dollars in funding from the industry it has supported. Far from it, AAPM has a page on its website purporting to list the "patrons" who have donated to the organization between January 1,

---

[23] U.S. Senate Homeland Security & Governmental Affairs Committee, Ranking Member McCaskill's Office, *Fueling the Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups* (Feb. 2017), at 1.

2017 and October 31, 2017—not a single opioid manufacturer (or other pharmaceutical company) is identified.[24]

90.     AAPM recently became known as the Academy of Integrative Pain Management ("AIPM").  Despite the change in name, the academy has remained a vehicle funded by and operated on behalf of pharmaceutical companies generally and opioid manufacturers specifically. AIPM's executive director, Bob Twillman, recently reported that AIPM receives fifteen (15) percent of its funding from pharmaceutical companies, not including revenue from advertisements in its publications.  Its state advocacy project, the academy's lobbying arm, is 100 percent funded by drug manufacturers and their allies.

**F.      Defendants Worked Together to Spread False and Deceptive Marketing Messages**

91.     Defendants worked together, through Front Groups, to spread their deceptive messages about the risks and benefits of long-term opioid therapy.  For example, Defendants combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project.  PCF is comprised of representatives from opioid manufacturers (including Cephalon, Endo, Janssen, and Purdue) and various Front Groups, almost all of which received substantial funding from Defendants.  Among other projects, PCF worked to ensure that an FDA-mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which Defendants determined would reduce prescribing.  PCF also worked to address a perceived "lack of coordination" among its members and developed "key" messages that were disseminated in programs and industry-run websites.

---

[24] *See* http://aapmfoundation.org/donors.

**G. Defendants' Marketing Scheme Misrepresented the Risks and Benefits of Opioids**

92.    To convince doctors and patients in Tennessee and across the nation that opioids can and should be used to treat chronic pain, Defendants had to convince them that long-term opioid use is both safe and helpful.  Knowing that they could do so only by deceiving those doctors and patients about the risks and benefits of long-term opioid use, Defendants made claims that were not supported by or were contrary to the scientific evidence.  Even though pronouncements by and guidance from the FDA and the CDC based on that evidence confirm that their claims were false and deceptive, Defendants have not corrected them, or instructed their KOLs or Front Groups to correct them, and continue to spread them today.

**H. Defendants Falsely Trivialized or Failed to Disclose the Known Risks of Long-term Opioid Use**

93.    To convince doctors and patients that opioids are safe, Defendants deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC.  These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that:  (1) starting patients on opioids was low-risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (2) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (3) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (4) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive.  Defendants have not only failed to correct these misrepresentations, they continue to make them today.

94. *First*, Defendants falsely claimed that the risk of addiction is low and that addiction is unlikely to develop when opioids are prescribed, as opposed to obtained illicitly; and failed to disclose the greater risk of addiction with prolonged use of opioids. Some illustrative examples of these false and deceptive claims are described below:

a. Actavis's predecessor caused a patient education brochure to be distributed in all states in 2007 that claimed opioid addiction is possible, but "less likely if you have never had an addiction problem." Upon information and belief, based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis continued to use this brochure in 2009 and beyond.

b. Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which instructed that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft. This publication is still available online.

c. Endo sponsored a website, Painknowledge.com, which claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."

d. Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem." A similar statement appeared on the Endo website www.opana.com.

e. Janssen reviewed, edited, approved, and distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which described as "myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

f. Janssen currently runs a website, Prescriberesponsibly.com (last updated July 2, 2015), which claims that concerns about opioid addiction are "overestimated."

g. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management* – which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to

31

"misconceptions about opioid addiction." This publication is still available online.

h.     Detailers for Purdue, Endo, Janssen, and Cephalon minimized or omitted any discussion with doctors of the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

95.     These claims are contrary to longstanding scientific evidence, as the FDA and CDC have conclusively declared. As noted in the 2016 CDC Guideline endorsed by the FDA, there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])." The Guideline points out that "[o]pioid pain medication use presents serious risks, including . . . opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."

96.     The FDA further exposed the falsity of Defendants' claims about the low risk of addiction when it announced changes to the labels for ER/LA (Extended Release/Long Acting) opioids in 2013 and for IR (immediate release) opioids in 2016. In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. The FDA further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed [opioids]."

97.     Defendants' claims are further proven false by the warnings on their FDA-approved drug labels that caution that opioids "expose users to risks of addiction, abuse and

misuse, which can lead to overdose and death," that the drugs contain "a substance with a high potential for abuse," and that addiction "can occur in patients appropriately prescribed" opioids.

98. The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder." Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. Endo remains free, however, to make those statements in Tennessee, nor has Endo engaged in a campaign to reverse the impact of previous statements that were to the contrary.

99. **Second**, Defendants falsely instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. Defendants called this phenomenon "pseudoaddiction" – a term coined by the now infamous Dr. David Haddox, who went to work for Purdue, and popularized by Dr. Russell Portenoy, a KOL for Cephalon, Endo, Janssen, and Purdue – and falsely claimed that pseudoaddiction is substantiated by scientific evidence. Some illustrative examples of these deceptive claims are described below:

   a. Cephalon and Purdue sponsored *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction, rather than true addiction. Responsible Opioid Prescribing remains for sale online.

The 2012 edition, which also remains available online, continues to teach that pseudoaddiction is real.

b.      Janssen sponsored, funded, and edited the *Let's Talk Pain* website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain is under-treated . . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management."

c.      Endo sponsored a National Initiative on Pain Control (NIPC) CME program in 2009 titled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

d.      Purdue published a pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated."

e.      Purdue sponsored a CME program entitled *Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse*. In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long-acting opioid.

f.      Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which states: "Pseudo-addiction describes patient behaviors that may occur when pain is undertreated . . . Pseudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated." This publication is still available online.

100.    The 2016 CDC Guideline rejects the concept of pseudoaddiction. Nowhere in the

Guideline does it recommend that opioid dosages be increased if a patient is not experiencing

pain relief. To the contrary, the Guideline explains that "[p]atients who do not experience

clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with

longer-term use," and that physicians should "reassess pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

101.    Even one of the Defendants has effectively repudiated the concept of pseudoaddiction.  In finding that "[t]he pseudoaddiction concept has never been empirically validated and in fact has been abandoned by some of its proponents," the State of New York, in its 2016 settlement with Endo, reported that "Endo's Vice President for Pharmacovigilance and Risk Management testified that he was not aware of any research validating the 'pseudoaddiction' concept" and acknowledged the difficulty in distinguishing "between addiction and 'pseudoaddiction.'"  Consistent with this, Endo agreed not to "use the term 'pseudoaddiction' in any training or marketing" in New York.  Endo, however, remains free to do so in Tennessee.

102.    *Third,* Defendants falsely instructed doctors and patients that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction.  These misrepresentations were especially insidious because Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids.  Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and patients more comfortable starting on opioid therapy for chronic pain.  Some illustrative examples of these deceptive claims are described below:

   a.    Endo paid for a 2007 supplement in the *Journal of Family Practice* written by a doctor who became a member of Endo's speakers bureau in 2010. The supplement, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids*, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid

therapy using a "maximally structured approach" involving toxicology screens and pill counts.

b. Endo, Janssen and Purdue all linked websites they ran or administered to Dr. Lynn Webster's Opioid Risk Tool, a brief questionnaire that gave doctors false confidence in prescribing opioids for chronic pain.

c. Purdue sponsored a 2011 webinar, *Managing Patient's Opioid Use: Balancing the Need and Risk*, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths."

d. As recently as 2015, Purdue has represented in scientific conferences that "bad apple" patients – and not opioids – are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

103. Once again, the 2016 CDC Guideline confirms that these statements were false, misleading, and unsupported at the time they were made by Defendants. The Guideline notes that there are no studies assessing the effectiveness of risk mitigation strategies – such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse – "for improving outcomes related to overdose, addiction, abuse, or misuse." As a result, the Guideline recognizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

104. **Fourth**, to underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, Defendants falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem, and failed to disclose the increased difficulty of stopping opioids after long-term use.

36

105.   For example, a CME sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days.  And Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur.

106.   Defendants deceptively minimized the significant symptoms of opioid withdrawal – which, as explained in the 2016 CDC Guideline, include drug cravings, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia (rapid heartbeat), spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction – and grossly understated the difficulty of tapering, particularly after long-term opioid use.  Yet the 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days."  The Guideline further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence" and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause and restart" tapers depending on the patient's response.  The CDC also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced or opioids are discontinued."

107.   ***Fifth***, Defendants falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk and failed to disclose the greater risks to patients at

higher dosages.  The ability to escalate dosages was critical to Defendants' efforts to market

opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors

would have abandoned treatment when patients built up tolerance and lower dosages did not

provide pain relief.  Some illustrative examples are described below:

a.   Actavis's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction."  Upon information and belief, based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis continued to use these materials in 2009 and beyond.

b.   Cephalon and Purdue  sponsored *APF's Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed.  The guide stated that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.  This guide is still available for sale online.

c.   Endo sponsored a website, painknowledge.com, which claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

d.   Endo distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics*, which was available during the time period of this Complaint on Endo's website.  In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?"  The response is, "The dose can be increased. . . . You won't 'run out' of pain relief."

e.   Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force.  This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages.

f.   Purdue's In the Face of Pain website promotes the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

g.   Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes

38

Case 1:18-cv-00061-TAV-CHS     Document 1     Filed 04/12/18     Page 38 of 77     PageID
#: 38

necessary," even unlimited ones, but did not disclose the risks from high opioid dosages. This publication is still available online.

h.  Purdue sponsored a CME entitled *Overview of Management Options* that is still available for CME credit.  The CME was edited by a KOL and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

i.  Purdue presented a 2015 paper at the College on the Problems of Drug Dependence, the "the oldest and largest organization in the US dedicated to advancing a scientific approach to substance use and addictive disorders,"[25] challenging the correlation between opioid dosage and overdose.

108.    These claims conflict with the scientific evidence, as confirmed by the FDA and CDC.  As the CDC explains in its 2016 Guideline, the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage."  More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages."  The CDC also states that "there is an increased risk for opioid use disorder, respiratory depression, and death at higher dosages."  That is why the CDC advises doctors to "avoid increasing dosages" above 90 morphine milligram equivalents per day.

109.    The 2016 CDC Guideline reinforces earlier findings announced by the FDA.  In 2013, the FDA acknowledged in response to a citizen petition by a physician group "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events."  For example, the FDA noted that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."  In fact, a recent study found that 92% of persons who died from an opioid-related overdose were initially prescribed opioids for chronic pain.

---

[25] www.cpdd.org.

110.    **_Finally_**, Defendants' deceptive marketing of the so-called abuse-deterrent

properties of some of their opioids, described below, has created false impressions that these

opioids can curb addiction and abuse.  Indeed, in a 2014 survey of 1,000 primary care

physicians, nearly half reported that they believed abuse-deterrent formulations are inherently

less addictive.[26]

111.    These abuse deterrent formulations (AD opioids) are harder to crush, chew, or

grind; become gelatinous when combined with a liquid, making them harder to inject; or contain

a counteragent such as naloxone that is activated if the tablets are tampered.  Despite this, AD

opioids are not "impossible to abuse."[27]  They can be defeated – often quickly and easily – by

those determined to do so.  Moreover, they do not stop oral intake, the most common avenue for

opioid misuse and abuse, and do not reduce the rate of misuse and abuse by patients who become

addicted after using opioids long-term as prescribed or who escalate their use by taking more

pills or higher doses.

112.    Because of these significant limitations on AD opioids and because of the

heightened risk for misconceptions and for the false belief that AD opioids can be prescribed

safely, the FDA has cautioned that "[a]ny communications from the sponsor companies

regarding AD properties must be truthful and not misleading (based on a product's labeling), and

supported by sound science taking into consideration the totality of the data for the particular

---

[26] Catherine S. Hwang, *et al.*, *Prescription Drug Abuse: A National Survey of Primary Care Physicians*, 175(2) JAMA INTERN. MED. 302-4 (Dec. 8, 2014).

[27] FDA Facts: Abuse-Deterrent Opioid, available at https://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm337066.htm [as of September 24, 2017].

drug. Claims for AD opioid products that are false, misleading, and/or insufficiently proven do not serve the public health."[28]

113.    Despite this admonition, Defendants have made and continue to make misleading claims about the ability of their so-called abuse-deterrent opioid formulations to prevent or reduce abuse and addiction and the safety of these formulations. For example, until July 2017 when Endo withdrew from the market in response to pressure from the FDA to do so, Endo marketed Opana ER as tamper, or crush, resistant and less prone to misuse and abuse even though: (1) the FDA rejected Endo's petition to approve Opana ER as abuse-deterrent in 2012; (2) the FDA warned in a 2013 letter that there was no evidence that Opana ER "would provide a reduction in oral, intranasal or intravenous abuse"; and (3) Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed. Endo's advertisements for the 2012 reformulation of Opana ER falsely claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse.

114.    In a 2016 settlement with the State of New York, Endo agreed not to make statements in New York that Opana ER was "designed to be, or is crush resistant." The State found those statements false and deceptive because there was no difference in the ability to extract the narcotic from Opana ER. The NY AG also found that Endo failed to disclose its own knowledge of the crushability of redesigned Opana ER in its marketing to formulary committees and pharmacy benefit managers.

115.    Because Opana ER could be "readily prepared for injection" and was linked to outbreaks of HIV and a serious blood disease, in May 2017, an FDA advisory committee recommended that Opana ER be withdrawn from the market. The FDA adopted this

---

[28] *Id.*

recommendation on June 8, 2017, and requested that Endo withdraw Opana ER from the market.[29]  Approximately one month later, Endo did so.[30]

116.    Likewise, Purdue has engaged in deceptive marketing of its AD opioids – i.e., reformulated Oxycontin and Hysingla.  Before April 2013, Purdue did not market its opioids based on their abuse deterrent properties.  However, beginning in 2013 and continuing until at least February 2018, detailers from Purdue regularly used the so-called abuse deterrent properties of Purdue's opioid products as a primary selling point to differentiate those products from their competitors.  Specifically, these detailers:  (1) claimed that Purdue's AD opioids prevent tampering and cannot be crushed or snorted; (2) claimed that Purdue's AD opioids prevent or reduce opioid misuse, abuse, and diversion, are less likely to yield a euphoric high, and are disfavored by opioid abusers; (3) claimed that Purdue's AD opioids are "safer" than other opioids; and (4) failed to disclose that Purdue's AD opioids do not impact oral abuse or misuse and that its abuse deterrent properties can be defeated.

117.    These statements and omissions by Purdue are false and misleading and conflict with or are inconsistent with the FDA-approved label for Purdue's AD opioids – which indicates that abusers do seek them because of their high likability when snorted, that their abuse deterrent properties can be defeated, and that they can be abused orally notwithstanding their abuse deterrent properties and which does not indicate that AD opioids prevent or reduce abuse, misuse, or diversion.

118.    To the contrary, testimony in litigation against Purdue and other evidence indicates that Purdue knew and should have known that "reformulated OxyContin is not better at

[29] Press Release, "FDA requests removal of Opana ER for risks related to abuse," June 8, 2017, available at: https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm562401.htm.

[30] Press Release, "Endo Provides Update On Opana ER," July 6, 2017, available at: http://www.endo.com/news-events/press-releases.

tamper resistance than the original OxyContin" and is still regularly tampered with and abused. Websites and message boards used by drug abusers, such as bluelight.org and Reddit, also report a variety of ways to tamper with OxyContin and Hysingla, including through grinding, microwaving then freezing, or drinking soda or fruit juice in which the tablet has been dissolved. Even Purdue's own website describes a study it conducted that found continued abuse of OxyContin with so-called abuse deterrent properties. Finally, there are no studies indicating that Purdue's AD opioids are safer than any other opioid products.

119. A 2015 study also shows that many opioid addicts are abusing Purdue's AD opioids through oral intake or by defeating the abuse deterrent mechanism. Indeed, *one-third* of the patients in the study defeated the abuse deterrent mechanism and were able to continue inhaling or injecting the drug. And to the extent that the abuse of Purdue's AD opioids was reduced, those addicts simply shifted to other drugs such as heroin.[31] Despite this, J. David Haddox, the Vice President of Health Policy for Purdue, falsely claimed in 2016 that the evidence does not show that Purdue's AD opioids are being abused in large numbers.

120. Similarly, the 2016 CDC Guideline states that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by nonoral routes." Tom Frieden, the Director of the CDC, has further reported that his staff could not find "any evidence showing the updated opioids [ADFs] actually reduce rates of addiction, overdoses, or death."[32]

---

[31] Cicero, Theodore J., and Matthew S. Ellis, "Abuse-deterrent formulations and the prescription opioid abuse epidemic in the United States: lessons learned from Oxycontin" (2015) 72.5 JAMA Psychiatry 424-430.

[32] Perrone, *Drugmakers push profitable, but unproven, opioid solution*, dated Dec. 15, 2016, available at https://www.publicintegrity.org/2016/12/15/20544/drugmakers-push-profitable-unproven-opioid-solution.

121.     These false and misleading claims about the abuse deterrent properties of their opioids are especially troubling.  First, these claims are falsely assuaging doctors' concerns about the toll caused by the explosion in opioid prescriptions and use and encouraging doctors to prescribe AD opioids under the mistaken belief that these opioids are safer, even though they are not.  These claims are therefore causing doctors to prescribe more AD opioids – which are far more expensive than other opioid products—even though they provide little or no additional benefit.

122.     Second, Defendants are using these claims in a spurious attempt to rehabilitate their image as responsible opioid manufacturers.  In response to the flood of litigation filed against the company, Defendant Purdue has been taking out full-page advertisements in the *Wall Street Journal* touting its efforts to stem the opioid epidemic.  Chief among Purdue's claims is its development of opioids with "abuse-deterrent properties."  Notably, the advertisement contains a footnote that Purdue's marketing materials never included, which states:  "Opioids with abuse-deterrent properties are not abuse-proof and don't prevent addiction, but they are part of a multifaceted approach to addressing the prescription opioid abuse crisis."

123.     These numerous, longstanding misrepresentations of the risks of long-term opioid use spread by Defendants successfully convinced doctors and patients to discount those risks.

## I.     Defendants Grossly Overstated the Benefits of Chronic Opioid Therapy

124.     To convince doctors and patients that opioids should be used to treat chronic pain, Defendants also had to persuade them that there was a significant upside to long-term opioid use.  But as the 2016 CDC Guidelines now make clear, there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain."  In fact, the CDC found that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized

44

trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use. The FDA, too, has recognized the lack of evidence to support long-term opioid use. In 2013, the FDA stated that it was "not aware of adequate and well-controlled studies of opioids use longer than 12 weeks." Despite this, Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence. Not only have Defendants failed to correct these false and deceptive claims, they continue to make them today.

125. For example, Defendants falsely claimed that long-term opioid use improved patients' function and quality of life. Some illustrative examples are described below:

a. Actavis distributed an advertisement that claimed that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives.

b. Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

c. Janssen sponsored and edited a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009) – which states as "a fact" that "opioids may make it easier for people to live normally." The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stair and states that "[u]sed properly, opioid medications can make it possible for people with chronic pain to 'return to normal.'"

d. Purdue ran a series of advertisements for OxyContin in 2012 in medical journals entitled "Pain vignettes," which were case studies featuring patients with pain conditions persisting over several months and recommending OxyContin for them. The ads implied that OxyContin improves patients' function.

e. *Responsible Opioid Prescribing* (2007), sponsored and distributed by Cephalon, Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function. The book remains for sale online.

f.       Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve." The guide was available online until APF shut its doors in 2012.

g.       Endo's NIPC website *painknowledge.com* claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site.

h.       Endo was the sole sponsor, through NIPC, of a series of CMEs titled *Persistent Pain in the Older Patient*, which claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast.

i.       Janssen sponsored, funded, and edited a website, *Let's Talk Pain*, in 2009, which featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function." This video is still available today on YouTube.

j.       Purdue sponsored the development and distribution of APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients." The Policymaker's Guide was originally published in 2011 and is still available online today.

k.       In a 2015 video on Forbes.com discussing the introduction of Hysingla ER, Purdue's Vice President of Health Policy, J. David Haddox, talked about the importance of opioids, including Purdue's opioids, to chronic pain patients' quality of life, and complained that CDC statistics do not take into account that patients could be driven to suicide without pain relief.

l.       Purdue's, Cephalon's, Endo's, and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

126.     These claims find no support in the scientific literature.  Most recently, the 2016

CDC Guideline approved by the FDA concluded that "there is <u>no good evidence</u> that opioids

improve pain or function with long-term use, and . . . complete relief of pain is unlikely."

(Emphasis added.)  The CDC reinforced this conclusion throughout its 2016 Guideline:

- "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . ."

- "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy."

- "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."

127.     The CDC also noted that the risks of addiction and death "can cause distress and

inability to fulfill major role obligations."  As a matter of common sense (and medical evidence),

drugs that can kill patients or commit them to a life of addiction or recovery do not improve their

function and quality of life.

128.     The 2016 CDC Guideline was not the first time a federal agency repudiated

Defendants' claim that opioids improved function and quality of life.  In 2010, the FDA warned

Actavis, in response to its advertising described in paragraph 40, that "[w]e are not aware of

substantial evidence or substantial clinical experience demonstrating that the magnitude of the

effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side

effects patients may experience . . . results in any overall positive impact on a patient's work,

physical and mental functioning, daily activities, or enjoyment of life."[33] And in 2008, the FDA

sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients

---

[33] Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), available at http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf.

47

who are treated with the drug experience an improvement in their overall function, social

function, and ability to perform daily activities . . . has not been demonstrated by substantial

evidence or substantial clinical experience."

129.    Defendants also falsely and misleadingly emphasized or exaggerated the risks of

competing products like NSAIDs, so that doctors and patients would look to opioids first for the

treatment of chronic pain.  For example, Defendants have overstated the number of deaths from

NSAIDS and have prominently featured the risks of NSAIDS, while minimizing or failing to

mention the serious risks of opioids.  Once again, these misrepresentations by Defendants

contravene pronouncements by and guidance from the FDA and CDC based on the scientific

evidence.  Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in

2016 to state that opioids should only be used as a last resort "in patients for which alternative

treatment options" like non-opioid drugs "are inadequate."  And the 2016 CDC Guideline states

that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis

and lower back pain.

130.    Defendants also have promoted opioids as providing far more effective pain relief

than NSAIDs and other non-opioid alternatives.  Studies indicate that this claim, too, is false.

Researchers recently analyzed the comparative effectiveness of four pain relief regimens in

treating 411 adult patients admitted to emergency rooms for acute extremity pain.  Three of the

regimens included an opioid combined with acetaminophen (*e.g.*, Tylenol).  The fourth was

composed of ibuprofen and acetaminophen.  The researchers asked patients receiving these

regimens to rank their pain on a scale of 0-10 both before receiving medication and two hours

later.  Researchers found that all four regimens reduced pain but that there was no statistically

significant difference in the reported reduction—in other words, that ibuprofen can be just as effective as opioids in treating pain.[34]

131.    In addition, Purdue misleadingly promoted OxyContin as being unique among opioids in providing 12 continuous hours of pain relief with one dose.  In fact, OxyContin does not last for 12 hours – a fact that Purdue has known at all times relevant to this action.  According to Purdue's own research, OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half.  This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers.  This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when less medicine is released.  This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial number" of chronic pain patients taking OxyContin experience it.  This not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

132.    Purdue's competitors were aware of this problem.  For example, Endo ran advertisements for Opana ER referring to "real" 12-hour dosing.  Nevertheless, Purdue falsely promoted OxyContin as if it were effective for a full 12 hours.  Indeed, Purdue's sales representatives continue to tell doctors that OxyContin lasts a full 12 hours.  And if a doctor suggests that OxyContin does not last 12 hours, these sales representatives, at Purdue's

---

[34] *See* Andrew K. Chang, MD, MS, Polly E. Bijur, PhD, David Esses, MD, Douglas P. Barnaby, MD, MS, Jesse Baer, MD, *Effect of Single Dose Opioid and Nonopioid Analgesics on Acute Extremity Pain in the Emergency Department*, JAMA (Nov. 2017).

instruction, recommend increasing the dose, rather than the frequency of use. Purdue gave its sales representatives these instructions to prevent doctors from switching to a different drug and to address the unwillingness of insurers to pay for more frequent use of OxyContin.

**J. Defendants Engaged In Other Unlawful, Deceptive and Unfair Misconduct**

133. Cephalon deceptively marketed its opioids Actiq and Fentora for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid-tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for or has been shown to be safe or effective for chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain, and refused to approve Fentora for the treatment of chronic pain because of the potential harm, including the high risk of "serious and life-threatening adverse events" and abuse – which are greatest in non-cancer patients. The FDA also issued a Public Health Advisory in 2007 emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post-operative pain, or pain due to injury.

134. Despite this, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe. As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain. For example:

- Cephalon paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of *Pain Medicine News* in 2009. The CME instructed doctors that "clinically, broad classification of pain syndromes as either cancer- or noncancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain. The CME is still available online.

50

- Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain.

- In December 2011, Cephalon widely disseminated a journal supplement entitled "*Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)*" to *Anesthesiology News*, *Clinical Oncology News*, and *Pain Medicine News* – three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer pain.

135.    Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses.

136.    For over a decade, Purdue has been able to track the distribution and prescribing of its opioids down to the retail and prescriber levels. Using this information, Purdue has maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs. Rather than report these doctors to state medical boards or law enforcement authorities (as is required) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin—the same OxyContin that Purdue had promoted as less addictive— in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In an interview with the *Los Angeles Times*, Purdue's senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, Purdue failed to take action – even where Purdue employees personally witnessed the diversion of its drugs. The same was true of prescribers; despite its knowledge of illegal prescribing, Purdue did not report until years after law enforcement shut down a Los Angeles clinic that prescribed more than 1.1 million OxyContin tablets and that Purdue's district manager

described internally as "an organized drug ring." In doing so, Purdue protected its own profits at the expense of public health and safety.

137. The State of New York's settlement with Purdue specifically cited the company for failing to adequately address suspicious prescribing. Yet, on information and belief, Purdue continues to profit from the prescriptions of such prolific prescribers.

138. Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the State of New York found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

## K. Defendants Targeted Susceptible Prescribers and Vulnerable Patient Populations

139. As a part of their deceptive marketing scheme, Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the United States, including in Tennessee. For example, Defendants focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs, but were less likely to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept Defendants' misrepresentations. Those primary care doctors then became sources of information for other doctors, including doctors in Tennessee.

140. Defendants also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain. Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. For example, the 2016 CDC Guideline observes that existing evidence shows that elderly patients taking

opioids suffer from elevated fall and fracture risks, greater risk of hospitalization, and increased vulnerability to adverse drug effects and interactions. The Guideline therefore concludes that there are "special risks of long-term opioid use for elderly patients" and recommends that doctors use "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients. The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post-traumatic stress disorder, which interact dangerously with opioids.

**L.    Although Defendants Knew That Their Marketing of Opioids Was False and Deceptive, They Fraudulently Concealed Their Misconduct**

141.    At all times relevant to this Complaint, Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and deceptive conduct. For example, Defendants disguised their own role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of Defendants' false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain. Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies that were not, and have not yet become, public. For example, painknowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other Defendants, such as Purdue and Janssen, ran similar websites that masked their own direct role.

142.    Nor have Defendants revealed the extent to which they have funded KOLs and Front Groups. Many Front Groups selectively disclose donors or provide no information

whatsoever concerning industry backers. After studying payments to opioid-advocacy Front Groups in the 2012-2017 period, the Senate concluded that neither pharmaceutical companies nor Front Groups "fully or routinely disclose the extent of their financial relationships" and both the companies and the groups "fail to adequately disclose manufacturer contributions" resulting in a "lack of transparency."[35]

143. Finally, Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could it have been detected by Hamilton County.

144. Thus, Defendants successfully concealed from the medical community, patients, and health care payors facts sufficient to arouse suspicion of the claims that Hamilton County now asserts. Hamilton County did not know of the existence or scope of Defendants' industry-wide deception and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

## M. Defendants Have Created a Public Nuisance

### 1. Defendants' Marketing Conduct Foreseeably Led to Opioid Abuse that has Wrought Havoc on Hamilton County

145. Most opioid use begins with prescribed opioids, and that is why the Defendants' deceptive marketing campaign was a primary cause of the opioid epidemic that has unfolded in Hamilton County and across the country.[36] For opioids to be widely prescribed, Defendants had

---

[35] Senate Homeland Security & Governmental Affairs Committee, Ranking Member McCaskill's Office, *Fueling the Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups* (Feb. 2018), at 1, 2, 11.

[36] *See* U.S. Dep't of Health & Human Servs., *2011 National Survey on Drug Use and Health*

to convince doctors that they were a safe and effective means of treating chronic conditions such as back pain, headaches, arthritis, and fibromyalgia. And they were successful in doing so. Had doctors in Hamilton County and elsewhere been provided accurate and complete information, they would not have prescribed as many opioids.

146. Defendants' deceptive marketing scheme also caused and continues to cause patients to purchase and use opioids for their chronic pain believing they are safe and effective. Without Defendants' deception, fewer patients in Hamilton County would be using opioids long-term to treat chronic pain, those patients using opioids would be using less of them, and there would not have been as many opioids available for misuse and abuse.

147. The efficacy of Defendants' marketing efforts can be seen by comparing opioid use in the United States against other countries, where restrictions on pharmaceutical advertising typically are more stringent. Although the United States contains only 4.6% of the world's population, Americans consume 80% of the global supply of prescription opioids.[37] Moreover, escalating opioid prescribing rates in the United States neatly track the elevated sums Defendants have expended on marketing their drugs, sums that rose from $91 million in 2000 to $288 million in 2011.

148. The role of Defendants' marketing scheme in contributing to the opioid epidemic has now been acknowledged by members of the medical community. Representing the NIH's National Institute of Drug Abuse in hearings before the Senate Caucus on International Narcotics Control in May 2014, Dr. Nora Volkow explained that "aggressive marketing by pharmaceutical companies" is "likely to have contributed to the severity of the current prescription drug abuse problem."[38]

---

(Sept. 2012), available at
https://www.samhsa.gov/data/sites/default/files/2011MHFDT/2k11MHFR/Web/NSDUHmhfr2011.htm.

[37] American Society of Interventional Pain Physicians, Fact Sheet, available at https://www.asipp.org/documents/ASIPPFactSheet101111.pdf.

[38] United States Cong., Senate Caucus on Int'l Drug Control, May 14, 2014, 113th Cong. 2nd sess. (Statement of Dr. Nora Volkow).

149.    In August 2016, then-U.S. Surgeon General Vivek Murthy published an open

letter to be sent to physicians nationwide, enlisting their help in combating this "urgent health

crisis" and linking that crisis to deceptive marketing.  He wrote that the push to aggressively treat

pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors

. . . [m]any of [whom] were even taught—incorrectly—that opioids are not addictive when

prescribed for legitimate pain."[39]

150.    Scientific evidence also demonstrates a strong correlation between opioid

prescriptions and opioid abuse.  In a 2016 report, the CDC explained that "[o]pioid pain reliever

prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."

Patients receiving prescription opioids for chronic pain account for the majority of overdoses.

For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic

pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-

related morbidity."

151.    The individual and combined effects of Defendants' conduct has caused in

Hamilton County, in the State of Tennessee and across the country an explosion in opioid

prescribing, abuse, and overdose.  The data are staggering.  In 2016, the opioid prescribing rate

in Hamilton County was 123 prescriptions per 100 people, meaning that there were more opioid

prescriptions issued in Hamilton County than there were people.[40]


**2.    Defendants Knew and Should Have Known That Their Conduct Would Lead
        to Overprescribing and Catastrophic Human and Economic Costs.**

152.    Defendants knew and should have known about the harms that their deceptive

marketing has caused.  Defendants closely monitored their sales and the habits of prescribing

doctors.  Their sales representatives, who visited doctors and attended CMEs, knew which

---

[39] Vivek H. Murthy, *Letter from the Surgeon General*, August 2016, available at
http://turnthetiderx.org/.

[40] CDC, U.S. State Prescribing Rates, 2016, available at:
https://www.cdc.gov/drugoverdose/maps/rxcounty2016.html

doctors were receiving their messages and how they were responding. Defendants also had access to and watched carefully government and other data that tracked the explosive rise in opioid use, addiction, injury, and death. In short, Defendants knew—and, indeed, intended—that their misrepresentations would persuade doctors to prescribe and patients to use their opioids for chronic pain, and they knew the lethal consequences of that endeavor.

153. Defendants also knew that patients were not the only ones harmed by their conduct. They knew that opioid dependency would place enormous burdens government resources, including those of Hamilton County.

**3. Defendants' Conduct Is Not Excused by the Actions of Any Third Parties.**

154. FDA approval of opioids for certain uses did not give Defendants license to misrepresent the risks and benefits of opioids. Indeed, Defendants' misrepresentations were directly contrary to pronouncements by and guidance from the FDA based on the medical evidence and their own labels.

155. Nor is Defendants' causal role broken by the involvement of doctors. Defendants' marketing efforts were ubiquitous and highly persuasive. Their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions. Defendants also were able to harness and hijack what doctors wanted to believe—namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

**N. Defendants' Conduct Has Caused Hamilton County Substantial Economic Injury.**

156. Defendants' conduct has caused Hamilton County to incur damages in various departments, including but not limited to, Criminal Court Judges, Clerks, Public Defenders, County Attorneys, District Attorneys, Corrections Department, Emergency Services, Emergency Management, Employee Clinic resources, Finance, Financial Management, Human Resources,

Health Department, Juvenile Court, Medical Examiner, Sheriff's Department, medical costs of citizens, and rehabilitation costs.

157. Defendants' deceptive marketing scheme, and the flood of opioids it has unleashed, also has created a larger public health crises that imposes an enormous tax burden on Hamilton County's resources. The cost mitigating the crisis is borne across an array of Hamilton County Governmental Departments, including, but not limited to, those listed in Paragraph 156.

158. These economic costs are direct, quantifiable, and would not have been incurred but for Defendants' conduct. They also do not express the full extent of the County's injuries. Abating the opioid crisis in Hamilton County will require a sustained and expanded outlay of county resources, including police opioid-related crime, and to process and rehabilitate opioid offenders through the criminal justice system.

**O.      Defendants' Conduct Has Led To Record Profits**

159. While the use of opioids has taken an enormous toll on Hamilton County and its residents, Defendants have realized blockbuster profits. In 2014 alone, opioids generated $11 billion in revenue for drug companies like the Defendants. Indeed, financial information indicates that each Defendant experienced a material increase in sales, revenue, and profits from the false and deceptive advertising and other unlawful and unfair conduct described above.

**P.      Distributor Defendants Flooded Hamilton County and Surrounding Communities with Suspiciously Large Amounts of Opioids**

160. The Distributor Defendants are opioid distributors in Hamilton County and the State of Tennessee.

161. The Distributor Defendants purchased opioids from manufacturers, such as the named defendants herein, and sold them to pharmacies throughout Hamilton County and the State of Tennessee.

162.    The Distributor Defendants played an integral role in the chain of opioids being distributed throughout Hamilton County and the state of Tennessee.

163.    The Defendants were each on notice that the controlled substances they manufactured and distributed were the kinds that were susceptible to diversion for illegal purposes, abused, overused, and otherwise sought for illegal and unhealthy purposes.

164.    The Defendants were each on notice that there was an alarming and suspicious rise in manufacturing and distributing opioids to retailers within Hamilton County during this time period.

165.    As entities involved in the manufacture and distribution of opioid medications, Defendants were engaged in abnormally and/or inherently dangerous activity and had a duty of care under Tennessee Law.

166.    The Defendants had a duty to notice suspicious or alarming orders of opioid pharmaceuticals and to report suspicious orders to the proper authorities and governing bodies including the DEA and the Tennessee Department of Health.

167.    The Defendants knew or should have known that they were supplying vast amounts of dangerous drugs in Hamilton County that were already facing abuse, diversion, misuse, and other problems associated with the opioid epidemic.

168.    The Defendants failed in their duty to take any action to prevent or reduce the distribution of these drugs.

169.    The Defendants were in a unique position and had a duty to inspect, report, or otherwise limit the manufacture and flow of these drugs to Hamilton County.

170.    The Defendants, in the interest of their own massive profits, intentionally failed in this duty.

171.    The Defendants have displayed a continuing pattern of failing to submit suspicious order reports.

172.    In 2008, McKesson paid a $13.25 million fine to settle similar claims regarding suspicious orders from internet pharmacies.[41]

173.    Despite these prior penalties, McKesson's pattern of failing to report suspicious orders continued for many years.

174.    According to the DEA, McKesson "supplied various U.S. pharmacies an increasing amount of oxycodone and hydrocodone pills" during the time in question, and "frequently misused products that are part of the current opioid epidemic."[42]

175.    On January 17, 2017, the DEA announced that McKesson had agreed to pay a record $150 million fine and suspend the sale of controlled substances from distribution centers in several states.[43]

176.    In 2008, defendant Cardinal paid a $34 million penalty to resolve allegations that it failed to report suspicious opioid orders.[44]

177.    Despite this past penalty, in 2017, it was announced that defendant Cardinal agreed to a $44 million fine to "resolve allegations that it failed to alert the Drug Enforcement Agency to suspicious orders of powerful narcotics by pharmacies in Florida, Maryland, and New York.

---

[41] http://www.wvgazettemail.com/news-health/20161218/suspicious-drug-order-rules-never- enforced-by-state (accessed May 30, 2017).

[42] https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure- report-suspicious-orders (accessed May 30, 2017).

[43] Id.

[44] https://www.justice.gov/usao-wdwa/pr/united-states-reaches-34-million-settlement-cardinal- health-civil-penalties-under-0 (access May 30, 2017).

178.     Defendant AmeriSource faced a criminal inquiry "into its oversight of painkiller sales" in 2012. They have paid out fines for similar claims to the state of West Virginia.

179.     Despite the charges, fines, and penalties brought against the Distributor Defendants in the past, they continued to fail to report suspicious orders or prevent the flow of prescription opioids, including into Hamilton County.

180.     The Distributor Defendants are also members of the Healthcare Distribution Management Association ("HDMA"). The HDMA created "Industry Compliance Guidelines" which stressed the critical role of each member of the supply chain in distributing controlled substances. The HDMA guidelines provided that "[a]t the center of a sophisticated supply chain, Distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

181.     Between the years in question, including 2007 through 2016, the Distributor Defendants have shipped millions of doses of highly addictive controlled opioid pain killers into Hamilton County.

182.     Many of these orders should have been stopped, or at the very least, investigated as potential suspicious orders.

183.     The sheer volume of the increase in opioid pain medications, including OxyCodone, being distributed to retailers, should have put the Defendants on notice to investigate and report such orders.

184.     The Defendants manufactured and delivered an excessive and unreasonable amount of opioid pain medications to retailers in Hamilton County.

185.     Upon information and belief, the Defendants did not refuse to manufacture, ship, or supply any opioid medications to any pharmacy in Hamilton County from 2007 to the present.

186.     The Defendants knew or should have known that they were manufacturing and distributing levels of opioid medications that far exceeded the legitimate needs of Hamilton County.

187.     The Defendants also paid their sales force bonuses and commissions on the sale of most or all of the highly addictive opioid pain medications within Hamilton County.

188.     The Defendants made substantial profits from the opioids sold in Hamilton County.

189.     The Defendants violated Tennessee law and regulations for manufacturers and distributors, by failing to properly report suspicious orders.

190.     By the actions and inactions described above, the Defendants showed a reckless disregard for the safety of the residents of Hamilton County.

191.     On December 27, 2007, the U.S. Department of Justice, Drug Enforcement Administration, sent a letter to Cardinal stating, "This letter is being sent to every entity in the United States registered with the Drug Enforcement Agency (DEA) to manufacture or distribute controlled substances. The purpose of this letter is to reiterate the responsibilities of controlled substance manufacturers and distributors to inform DEA of suspicious orders in accordance with 21 C.F.R. § 1301.74(b)."

192.     The DEA has provided briefings to each of the Defendant Distributors and conducted a variety of conferences regarding their duties under federal law.

193.     The DEA sent a letter to each of the Defendant Distributors on September 26, 2006, warning that it would use its authority to revoke and suspend registrations when appropriate. The letter expressly states that a distributor, in addition to reporting suspicious orders, has a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels." The DEA warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."

194.     The DEA sent a second letter to each of the Defendant Distributors on December 27, 2007. This letter reminded the Defendant Distributors of their statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances." The letter further explains:

> The regulation also requires that the registrant inform the local DEA Division Office of suspicious orders when discovered by the registrant. Filing a monthly report of completed transactions (e.g., "excessive purchase report" or "high unity purchases") does not meet the regulatory requirement to report suspicious orders. Registrants are reminded that their responsibility does not end merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels. Reporting an order as suspicious will not absolve the registrant of responsibility if the registrant knew, or should have known, that the controlled substances were being diverted.

> The regulation specifically states that suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency. These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a registrant need not wait for a "normal pattern" to develop over time before determining whether a particular order is suspicious. The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's

responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer, but also on the patterns of the registrant's customer base and the pattern throughout the segment of the regulated industry. Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient. This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor. Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially. Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the normal pattern of what pharmacies generally order.

When reporting an order as suspicious, registrants must be clear in their communication with DEA that the registrant is actually characterizing an order as suspicious. Daily, weekly, or monthly reports submitted by registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."

Lastly, registrants that routinely report suspicious orders, yet fill these orders without first determining that order is not being diverted into other than legitimate medical, scientific, and industrial channels, may be failing to maintain effective controls against diversion. Failure to maintain effective controls against diversion is inconsistent with the public interest as that term is used in 21 U.S.C. §§ 823 and 824, and may result in the revocation of the registrant's DEA Certificate of Registration.

195.     As a result of the decade-long refusal by the Defendant Distributors to abide by federal law, the DEA has repeatedly taken administrative action to force compliance. The United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Divisions, reported that the DEA issued final decisions in 178 registrant actions between 2008 and 2012. The Office of Administrative Law Judges issued a recommended decision in a total of 177 registrant actions before the DEA issued

its final decision, including 76 actions involving orders to show cause and 41 actions involving immediate suspension orders. The Drug Enforcement Administration's Adjudication of Registrant Actions, United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Divisions, I-2014-003 (May 2014). The public record reveals many of these actions:

> On April 24, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the AmerisourceBergen Orlando, Florida distribution center (Orlando Facility) alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement which resulted in the suspension of its DEA registration;

> On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Auburn, Washington Distribution Center (Auburn Facility) for failure to maintain effective controls against diversion of hydrocodone;

> On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Lakeland, Florida Distribution Center (Lakeland Facility) for failure to maintain effective controls against diversion of hydrocodone;

> On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Swedesboro, New Jersey Distribution Center (Swedesboro Facility) for failure to maintain effective controls against diversion of hydrocodone;

> On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Stafford, Texas Distribution Center (Stafford Facility) for failure to maintain effective controls against diversion of hydrocodone;

> On May 2, 2008, McKesson Corporation entered into an Administrative Memorandum of Agreement (2008 MOA) with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

On September 30, 2008, Cardinal Health entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility, and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Tennessee (McDonough Facility), Valencia, California (Valencia Facility) and Denver, Colorado (Denver Facility);

On February 2, 2012, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Lakeland, Florida Distribution Center (Lakeland Facility) for failure to maintain effective controls against diversion of oxycodone;

On June 11, 2013, Walgreens paid $80 million in civil penalties for dispensing violations under the CSA regarding the Walgreens Jupiter Distribution Center and six Walgreens retail pharmacies in Florida;

On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

On January 5, 2017, McKesson Corporation entered into an Administrative Memorandum Agreement with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora, CO; Aurora, IL; Delran, NJ; LaCrosse, WI; Lakeland, FL; Landover, MD; La Vista, NE; Livonia, MI; Methuen, MA; Sante Fe Springs, CA; Washington Courthouse, OH; and West Sacramento, CA

Rather than abide by these public safety statutes, the Defendant Distributors, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's license from "imminent harm" to "immediate harm" and

provided the industry the right to "cure" any violations of law before a suspension order can be issued.[45]

**FIRST CAUSE OF ACTION**
**PUBLIC NUISSANCE**

**TENNESSEE COMMON LAW**

196.     The County realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

197.     Under Tennessee law, a "public nuisance" is defined as any "condition of things which is prejudicial to health, comfort, safety, property, sense of decency of morals of the citizens at large, resulting either from an act not warranted by law, or from neglect of a duty imposed by law." *State ex. rel. Swann v. Pack,* 527 S.W.2d 99, 113 (Tenn. 1975).

198.     Defendants, individually and in concert with each other, have engaged in improper and unlawful conduct that is injurious to public health and safety and has caused material discomfort and annoyance to the public at large.

199.     The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community and the harm inflicted outweighs any offsetting benefit.  Immediate judicial intervention is needed to address the nuisance Defendants have created.

---

[45] *See* Lenny Bernstein and Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, WASH. POST (Oct. 22, 2016), https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid- epidemic- grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html?utm_term=.d84d374ef062; Lenny Bernstein and Scott Higham, *Investigation:*
*U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, WASH. POST (Mar. 6, 2017), https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea- enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html?utm_term=.b44410552cde.

200.    Manufacturer Defendants knew or should have known that their promotion of opioid use would create a public nuisance.

201.    Distributor Defendants knew or should have known that their excessive distribution of opioids would result in an oversaturation of opioids throughout Hamilton County that would create a public nuisance.

202.    Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used.  Without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

203.    The health and safety of the citizens of Hamilton County, including those who use, have used or will use opioids, as well as those affected by opioid use, is a matter of great public interest and of legitimate concern to the County.

204.    The County seeks an order that enjoins the Manufacturer Defendants' unlawful marketing scheme and provides for the abatement of the nuisance it has created.

205.    The County seeks an order that enjoins the Distributor Defendants from failing to fulfil their obligations to prevent opioid diversion and the nuisance it has created.

## SECOND CAUSE OF ACTION
## STATUTORY PUBLIC NUISSANCE

(Tenn. Code Ann. § 29-3-101, *et seq.*)

206.    The County realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

207.    Under Tennessee statutory law, "[a]ny person who uses, occupies, establishes or conducts a nuisance, or aids or abets therein, and the owner, agent or lessee of any interest in any such nuisance, together with the persons employed in or in control of any such nuisance by any

68

such owner, agent or lessee, is guilty of maintaining a nuisance and such nuisance shall be abated as provided hereinafter." Tenn. Code Ann. § 29-3-101(b).

208.    The term "nuisance" includes "[a]ny place in or upon which. . . [the] unlawful sale of any regulated legend chug, narcotic or other controlled substance . . . are carried on or permitted, and personal prope1ty, contents, furniture, fixtures, equipment and stock used in or in connection with the conducting and maintaining any such place for any such purposes." Id. § 29-3-101 (a)(2)(A).

209.    The nuisance statute further provides that, in an "order of abatement, the court may . . . assess costs of public services required to abate or manage the nuisance, including, but not limited to, law enforcement costs, if any, caused by the public nuisance." Id. § 29-3-110.

210.    Defendants, individually and in concert with each other, have engaged in improper and unlawful conduct that is injurious to public health and safety and has caused material discomfort and annoyance to the public at large.

211.    The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community and the harm inflicted outweighs any offsetting benefit.  Immediate judicial intervention is needed to address the nuisance Defendants have created.

212.    Defendants knew or should have known that their promotion of opioid use would create a public nuisance.

213.    Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used.  Without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

214.    The health and safety of the citizens of Hamilton County, including those who use, have used or will use opioids, as well as those affected by opioid use, is a matter of great public interest and of legitimate concern to the State.

215.    The County seeks an order that enjoins Defendants' unlawful marketing scheme and provides for the abatement of the nuisance it has created.

216.    The County seeks an order that enjoins the Distributor Defendants from failing to fulfil their obligations to prevent opioid diversion and the nuisance it has created.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT

### TENNESSEE COMMON LAW

217.    The County realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

218.    Under Tennessee law, unjust enrichment can be found when a party has received something of value to which he was not entitled by operative act, intent, or situation to make the enrichment unjust and compensable.

219.    Through their deceptive and unlawful marketing of opioids for chronic pain, Defendants have been unjustly enriched at the County's expense.  Because of Defendants' scheme, the County has conferred a benefit on Defendants by working to address the opioid epidemic, including but limited to, police protection and law enforcement as a result of opioid users; abatement of nuisance's, and all other efforts to deal with the growing epidemic and permitting Defendants to retain overpayments it fraudulently procured would be unjust and inequitable.

220.    The County seeks restitution of the sum, to be determined at trial, by which Defendants have been unjustly enriched.

## FOURTH CAUSE OF ACTION
## TENNESSEE DRUG DEALER LIABILITY ACT

(Tenn. Code Ann. §29-38-101 *et seq*)

221.    The County realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

222.    Tennessee's DDLA, Tenn. Code Ann. § 29-38-101 *et seq.*, provides a civil remedy for "damages to persons in a community as a result of illegal drug use." Tenn. Code Ann. §29-38-102.

223.    Among persons to whom the DDLA provides a remedy are "[a]…governmental entity, … or other entity that funds a drug treatment program or employee assistance program for the individual drug user, or that otherwise expended on behalf of the individual drug user." Tenn. Code Ann. § 29-38-106.

224.    One of the intents of the DDLA, among others, is "to shift, to the extent possible, the cost of damage caused by the existence of the illegal drug market in a community to those who illegally profit from the market." Tenn. Code Ann. § 29-38-102.

225.    Plaintiff is a governmental entity that funds drug treatment and assistance programs for individual drug users in Hamilton County, and otherwise expended significant sums of money as a result of the illegal distribution of opioids in Hamilton County.

226.    The DDLA makes anyone who "knowingly participates in the illegal drug market within the state … liable for civil damages." Tenn. Code Ann. § 29-38-105(a).

227.    "A person may recover damages under [the DDLA] … for injury resulting from an individual's use of an illegal drug." Tenn. Code Ann. § 29-38-105(b).

228.    Under Tennessee criminal laws, such as Tenn. Code Ann. § 39-17-417 and Tenn. Code Ann. § 39-17-418, hydrocodone, oxycodone, oxymorphone, Roxicodone, OxyContin, Opana, Lortab, and other opioids are illegal drugs if possessed, sold, and distributed without a valid prescription.

229. The DDLA imposes liability on those who directly participate in the distribution of an illegal drug that causes damages. Damages may be recovered under the DDLA from a "person who knowingly distributed, or knowingly participated in the chain of distribution of, an illegal drug that was actually used by the individual drug user." Tenn. Code Ann. § 29-38-106 (b)(1).

230. The DDLA also imposes market liability on those who participate in the unlawful distribution of drugs in the area where illegal drugs cause damages. Damages may be recovered under the DDLA from a "person who knowingly participated in the illegal drug market, if (A) [t]he place of illegal drug activity by the individual drug user is within the illegal drug market target community of the defendant; (B) the defendant's participation in the illegal drug market was connected with the same type of illegal drug used by the individual drug user; and (C) [t]he defendant participated in the illegal drug market at any time during the individual user's period of illegal drug use." Tenn. Code Ann. § 29-38-106(b)(2)(A)-(C)

231. For purposes of the DDLA, an "individual drug user means the individual whose illegal drug use is the bases of an action brought under [that statute]," Tenn. Code Ann. § 29-38-104(4).

232. Residents of Hamilton County who acquired hydrocodone, oxycodone, oxymorphone, Roxicodone, OxyContin, and/or Opana from unlicensed drug dealers illegally distributing the prescription opioids in Hamilton County are "individual drug user[s]" under the DDLA.

233. Those purchases of hydrocodone, oxycodone, oxymorphone, OxyContin, Roxicodone and/or Opana were illegal in that they were made without a valid prescription as required by Tenn. Code Ann. § 53-l l-308(a).

234. Defendants knowingly participated in the manufacture and/or distribution of prescription opioids that reached Hamilton County during all times relevant to this complaint.

For purposes of the DDLA, Defendants' "illegal drug market target community" is the entire state of Tennessee, because Defendants participated in the illegal drug market by distributing 4 ounces or more of a "specified illegal drug." Tenn. Code Ann §§ 29-38- 104(8), 29-38-109(4). As noted by the Tennessee Department of Health in a 2015 presentation, the Tennessee market for hydrocodone and oxycodone pills comprised of 51 hydrocodone pills and 21 oxycodone pills for every Tennessean. Commissioner of Health Dreyzehner noted that 50% of mothers of NAS babies obtained their pills, in whole or in part, from diverted pills (28.7% solely from diverted drugs). Given that a single oxycodone tablet, on information and belief, weighs approximately 135 mg and contains at least 10 mg of opioid, there can be no question that each of the Manufacturer Defendants far exceeded the four-ounce level.

235. The Manufacturer Defendants knowingly failed to implement effective controls and procedures in their supply chains to guard against theft, diversion, and abuse of prescription opioids, and failed to adequately design and operate a system to detect, halt, and report suspicious orders of prescription opioids.

236. As a result, the Manufacturer Defendants knowingly disseminated massive quantities of prescription opioids for distribution to Hamilton County, including "pill mills," and other drug dealers.

237. The Defendants also knowingly enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including "pill mills" as well as and other drug dealers, knowing that such opioids would be illegally trafficked and abused.

238. The diversion of prescription opioids into the secondary, criminal market and the increase in the number of individuals who abuse or are addicted to opioids has place unnecessary and excessive demands on the medical, public health, law enforcement, and financial resources

of Hamilton County.

239.     Having knowingly participated in the illegal distribution of hydrocodone, oxycodone, oxymorphone, OxyContin, Roxicodone, and/or Opana, the drugs purchased or obtained by residents of Hamilton County in the "place of illegal drug activity," Defendants are liable to Plaintiff Hamilton County under the DDLA even for damages caused by opioids in Hamilton County that were acquired from distribution channels in which Defendants were a market participant.

### FIFTH CAUSE OF ACTION

### CIVIL CONSPIRACY
### TENNESSEE COMMON LAW

(Against Purdue, Janssen, Cephalon, and Endo)

240.     The County realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

241.     This claim is brought against Defendants Purdue, Janssen, Cephalon and Endo. Throughout this Cause of Action only, "Defendants" refers to only these defendants.

242.     Under Tennessee law, a civil conspiracy occurs when two or more persons have combined to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or immoral, but by unlawful, oppressive or immoral means, to injury of another.

243.     As described more fully above, (a) Defendants, together with (b) Front Groups and (c) KOLs, coordinated their efforts, as part of a shared plan and pursuant to a common agreement, to deceptively market opioids for chronic pain in Hamilton County, in Tennessee and across the nation.

244. The purpose of this conspiracy, deceiving health care providers, patients and the general public, was unlawful, violating, at a minimum, Tennessee nuisance law, and Tennessee common law.

245. To accomplish their unlawful objectives, Defendants, Front Groups, and KOLs, acting collectively, systematically misrepresented to the general public and Tennessee consumers – either affirmatively or through half-truths and omissions – the risks and benefits of using opioids for chronic pain. In particular, these conspirators concealed from the public and Hamilton County consumers the serious risks and lack of corresponding benefits of using opioids for chronic pain. These misrepresentations ensured that a larger number of opioid prescriptions would be written and filled for chronic pain in Tennessee and elsewhere. This translated into higher sales (and therefore profits) for Defendants.

246. The conspiracy was the product of agreement and operated hierarchically with Defendants controlling the representations made about their respective drugs. The Front Groups and KOLs participated knowing, but without disclosing, that other Front Groups and KOLs were involved in the same scheme. But for their agreement to participate in the conspiracy, Front Groups and KOLs would have been incentivized to disclose Defendants' deceit to their constituents and to protect patients. They each joined the conspiracy with the expectation that the deceit would not be revealed by their co-conspirators. And when issues arose during the scheme, each agreed to take actions to hide the scheme and continue its existence.

247. Hamilton County seeks an order enjoining further operation of the civil conspiracy, damages in an amount to be determined at trial, and all other relief provided by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court:

A. Enter a judgment against Defendants and in favor of Plaintiff for the amount of damages sustained by the Plaintiff as a result of Defendants' actions;

B. Order the Defendants to cease and desist their unlawful conduct;

C.      Order the Defendants to abate the public nuisance that they created in violation of Tennessee common and statutory law, including by paying damages equaling the cost of abatement;

D.      Order the Defendants to pay restitution to the full extent permitted by law;

E.      Order the Defendants to pay punitive damages;

F.      Order the Defendants to pay the costs of bringing this action, investigative costs and fees, and attorneys' fees;

G.      Require the Defendants to disgorge their unjustly acquired profits and other monetary benefits resulting from their unlawful conduct, and provide restitution to the Plaintiff; and

H.      Order such other and further relief as the Court deems just, necessary and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Hamilton County demands a trial by jury on all issues so triable.

Filed on this the 12th day of April, 2018                    Respectfully submitted,

s/Ronald J. Berke

BERKE, BERKE, & BERKE
Ronald J. Berke (BPR #1741)
420 Frazier Avenue
P.O. Box 4747
Chattanooga, TN  37405
(423) 255-5171
ronnie@berkeattys.com

FOX & FARLEY
Bruce Fox (BPR #8965)
310 N Main Street
Clinton, TN 37716
(865) 457-6440
brucefox@foxandfarleylaw.com

MIKE MOORE LAW FIRM, LLC
Mike Moore
Jonathan Compretta
10 Canebrake, Suite 150
P.O. Box 321048
Flowood, MS  39232
(601) 933-0070
mm@mikemoorelawfirm.com
jc@mikemoorelawfirm.com

LAW OFFICE OF JOSEPH C. TANN,
PLLC
Joseph Tann
60 E. Rio Salado Pkwy, Suite 900
Tempe, Arizona 85281
(602) 432-4241
josephtann@josephtann.com

KINNARD CLAYTON & BEVERIDGE
Randall L. Kinnard (BPR #4714)
Daniel L. Clayton (BPR #12600)
127 Woodmont Blvd
Nashville, TN 37205
(615) 297-1007
rkinnard@kcbattys.com
dclayton@kcbattys.com

BAILEY & GREER, PLLC
Thomas R. Greer (BPR #24452
6256 Poplar Avenue
Memphis, TN  38119
(901) 680-9777
tgreer@BaileyGreer.com

77